INMAN, Judge.
*196 Plaintiffs are 262 property owners in SeaScape at Holden Plantation ("SeaScape"), a residential subdivision near Holden Beach, North Carolina. They appeal from the trial court's orders: (1) dismissing plaintiffs' derivative claims brought on behalf of SeaScape at Holden Plantation Property Owners Association, Inc. ("the POA") against third parties involved in the development and construction of SeaScape[1] ; (2) dismissing plaintiffs' derivative claims against certain members of the POA's Executive Board and the Executive Board itself[2] ; and (3) denying plaintiffs' motion to dismiss the POA's intervenor complaint. After careful review, we affirm the trial court's orders.
*83 Although the facts of this case are unique, the legal issues presented are characteristic of corporate governance disputes between homeowners and managing bodies of planned communities. Among other things, this Court must consider the principles of derivative litigation as well as the statutory framework for intracorporate governance under the North Carolina Planned Community Act and the North Carolina Nonprofit Corporation Act.
Background
Plaintiffs allege the following in their Fourth Amended Verified Complaint filed 31 March 2014: In 1999, Mark Saunders (together with related LLCs[3] , "the Developers") began developing SeaScape, an upscale 542-lot coastal residential subdivision. The SeaScape plans provided for *197 a 75-slip marina, a concrete bulkhead to protect the shore from natural erosion, and the preservation of existing natural ponds.
The Developers drafted the POA's Master Declaration, reserving the power to veto any action of the POA and to appoint and dismiss Executive Board members until 31 December 2020. Under the Master Declaration, the POA has no right to remove, revoke, or modify any right or privilege of the Developers. Plaintiffs allege that the majority of the members appointed to the Executive Board since SeaScape's creation have been employees of the Developers, and therefore, the Executive Board has an inherent conflict of interest in holding the Developers liable for the defective construction of the SeaScape common areas.
Construction on the bulkhead began in or about 2001, almost two years before the Developers applied for a building permit from Brunswick County. On plaintiffs' information and belief, Brunswick County building inspectors knew or should have known that the marina and bulkhead were being constructed without required permits or inspections but ignored the ongoing construction.
Defects in the bulkhead became apparent in 2005, when two major storms hit the area. Although it should have withstood maximum flood conditions, the SeaScape bulkhead was damaged and moved approximately six inches. On or around 19 October 2006, the Developers asked Cape Fear Engineering, which initially oversaw construction and engineering, to determine the cause of the damages and repair the bulkhead. Cape Fear made no repairs over the following three years.
On 21 December 2009, four years after the first damage to the bulkhead was discovered, Saunders conveyed the marina and bulkhead to the POA. After another storm hit in September 2010, the bulkhead moved an additional six inches.
Plaintiffs also allege that the Developers improperly installed perforated storm sewer pipes around two natural ponds at SeaScape, despite warnings from hydrogeological investigators that such pipes could drain the ponds. Since the installation of the perforated pipes, both of the ponds have completely drained. Plaintiffs complained about the ponds, and although the Developers made assurances that the ponds would be restored, they never informed plaintiffs that improper piping had been installed. In June 2009, plaintiffs discovered the perforated piping.
Plaintiffs allege they demanded that the Executive Board require the Developers to correct the defects in the SeaScape common areas. Plaintiffs claim that, because it is essentially controlled by the *198 Developers, the Executive Board has taken no action adverse to those parties and instead attempted to pass the cost of repairs to the POA members.
In 2012, two of the five members on the POA Executive Board-Helen Stead ("Stead") and Curt Bolden ("Bolden")-had no employment relationship with the Developers or any of the third parties. At a Special Meeting on 21 September 2012, Stead and Bolden voted to initiate litigation against the third parties seeking repair or to recover costs for damages to the common areas. The three other Executive Board members at that time-Eric Johnson ("Johnson"), Brad Cheers ("Cheers"), and Carroll *84 Lipscombe ("Lipscombe")-abstained from voting, presumably due to their status as employees of the Developers.
Plaintiffs filed their first complaint on 5 October 2012, almost two weeks after the Special Meeting vote. In addition to various individual claims, plaintiffs brought claims derivatively on behalf the POA against members of the Executive Board and the third parties involved in the development and construction of the common areas. The POA moved to intervene as a party-plaintiff on 27 November 2012. Attached to its motion to intervene was a draft complaint which included essentially the same claims against the third parties as did plaintiffs' complaint, but omitted claims against Executive Board members. The trial court's denial of the POA's motion to intervene was reversed by this Court on 21 January 2014. See Anderson v. Seascape at Holden Plantation, LLC, --- N.C.App. ----, 753 S.E.2d 691 (2014) ("Anderson I ").
On 14 February 2014, less than one month after this Court's reversal, the POA filed its Amended Intervenor Complaint, alleging the same claims against the third parties that plaintiffs initially pursued derivatively. Plaintiffs filed their Fourth Amended Verified Complaint on 31 March 2014, adding the POA as a nominal defendant. The Fourth Amended Verified Complaint contained no mention of the POA's Intervenor Complaint or the Special Meeting vote in 2012 to pursue litigation against the third parties.
Shortly after plaintiffs filed the Fourth Amended Verified Complaint, the POA, the third parties, and Executive Board members moved to dismiss the derivative claims brought by plaintiffs, and plaintiffs moved to dismiss the POA's intervenor complaint. The trial court granted the motions to dismiss plaintiffs' derivative claims against the third parties, against five of eleven Executive Board members, and against the Executive Board as an entity. The trial court also denied plaintiffs'
*199 motion to dismiss the POA's intervenor complaint. Plaintiffs filed timely notice of appeal from these orders.
Grounds for Appellate Review
We must first address the issue of appellate jurisdiction. Because outstanding individual and derivative claims remain pending before the trial court, the orders from which plaintiffs appeal are interlocutory. See, e.g., Veazey v. City of Durham, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950). "Generally, there is no right of immediate appeal from interlocutory orders and judgments." Goldston v. Am. Motors Corp., 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990). We note that the trial court here did not certify its orders for immediate appeal pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure. See N.C. Gen.Stat. § 1A-1, Rule 54 (2013). However, appeal from an interlocutory order is proper where the order deprives the appellant of a substantial right which would be lost without immediate review. N.C. Gen.Stat. § 1-277(a) (2013) ; N.C. Dep't of Transp. v. Page, 119 N.C.App. 730, 734, 460 S.E.2d 332, 334 (1995).
The avoidance of two trials on the same issues can constitute a substantial right and therefore would warrant immediate appeal. Green v. Duke Power Co., 305 N.C. 603, 608, 290 S.E.2d 593, 596 (1982). This Court has previously held that a substantial right was affected where an order dismissed claims against one of several "collusive" defendants, thus raising the possibility of multiple trials against different members of the same group where the same issues would be in contention. See Jenkins v. Wheeler, 69 N.C.App. 140, 142, 316 S.E.2d 354, 356 (1984).
The potential for multiple trials on the same issues exists in this case. Plaintiffs and the POA are wrestling to bring substantially the same claims against the third parties, so that if the dismissal of plaintiffs' derivative claims were reversed after entry of final judgment on the POA's claims, certain issues would have to be relitigated. Plaintiffs also risk multiple trials against two groups of Executive Board members-those who remain at this stage and those who were dismissed by the trial court-based on the same factual allegations. Accordingly, we conclude that plaintiffs have demonstrated that a substantial right would be lost without immediate appellate review of the trial court's orders, and we will reach the merits *85 of their arguments here. See Jenkins, 69 N.C.App. at 142, 316 S.E.2d at 356 ; see also Green, 305 N.C. at 608, 290 S.E.2d at 596. *200 I. Derivative Claims Against Third Parties
Plaintiffs first argue that the trial court erred by concluding that they did not have standing to bring derivative claims against the third parties. They also contend that the trial court erred by denying their motion to dismiss the POA's intervenor complaint. We disagree with both contentions.
The third parties and the POA moved to dismiss plaintiffs' derivative claims pursuant to Rule 12(b)(6) and/or Rule 12(c) of the North Carolina Rules of Civil Procedure. " Rule 12(b)(6) generally precludes dismissal except in those instances where the face of the complaint discloses some insurmountable bar to recovery." Meadows v. Iredell County, 187 N.C.App. 785, 787, 653 S.E.2d 925, 927 (2007) (internal quotation marks omitted). "One such bar to recovery is a lack of standing, which may be challenged by a motion to dismiss for failure to state a claim upon which relief may be granted." Id. "The purpose of Rule 12(c) is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." Coker v. DaimlerChrysler Corp., 172 N.C.App. 386, 390, 617 S.E.2d 306, 309 (2005) (quotation marks omitted). For purposes of review on either ground, this Court conducts a de novo review of the pleadings to assess their legal sufficiency, Burgin v. Owen, 181 N.C.App. 511, 512, 640 S.E.2d 427, 429 (2007), and treats the factual allegations in the complaint as true, Hargrove v. Billings & Garrett, Inc., 137 N.C.App. 759, 760, 529 S.E.2d 693, 694 (2000) ; Thompson v. Town of Warsaw, 120 N.C.App. 471, 473, 462 S.E.2d 691, 692 (1995).
All of plaintiffs' claims at issue in this appeal are derivative. In general terms, "[a] derivative proceeding is a civil action brought by a shareholder in the right of a corporation, while an individual action is one a shareholder brings to enforce a right which belongs to him personally." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C.App. 390, 395, 537 S.E.2d 248, 253 (2000) (citation and quotation marks omitted). As members of the POA, a nonprofit corporation, plaintiffs brought their derivative claims pursuant to N.C. Gen.Stat. § 55A-7-40 (2013) under the North Carolina Nonprofit Corporation Act.
In the first instance, the POA contends plaintiffs failed to comply with the pleading requirements of section 55A-7-40(b). Section 55A-7-40(b) provides that a complaint brought in the right of a nonprofit corporation by its members "shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Plaintiffs argue *201 that they were not required to make a demand on the POA prior to filing suit because the words "if any" in section 55A-7-40(b) demonstrate the General Assembly's intention to allow for the equitable exception of futility to the demand requirement.[4] In the alternative, plaintiffs contend that they satisfied the demand requirement and sufficiently pled their demand attempts in the Fourth Amended Verified Complaint.
In this case, we need not resolve the parties' dispute regarding the potential pleading requirements of demand and futility in section 55A-7-40. This Court's prior decision renders it the law of the case that the POA has the right to intervene in this litigation, Anderson I, --- N.C.App. at ----, 753 S.E.2d at 698, and the POA has done so by filing an intervenor complaint alleging substantially the same claims against the third parties that plaintiffs brought derivatively.
Even if we assume that all pleading requirements have been met, we cannot conclude *86 that plaintiffs therefore automatically prevail on the issue of standing. The dispositive issue is who-the POA, plaintiffs, or both-has standing to bring these claims where both groups seek the exclusive right to do so.
No prior North Carolina appellate court decision has applied the principles of standing where both a corporation and its shareholders attempt to bring the same claims against third parties. This appears to be the first case to reach our appellate courts that features corporate assent to demand. See Cox, Heroes in the Law: Alford v. Shaw, 66 N.C. L. Rev. 565, 577 (1988) ("In no reported case has a special litigation committee recommended continuance of the suit against a colleague. Even more telling is the absence of any reported instance in which the directors have approved a suit's continuance in response to the plaintiff's demand."). In order to resolve this issue, we must determine: (1) whether the steps taken by the POA to institute this litigation were valid; and (2) what legal effect the POA's filing of the intervenor complaint had on plaintiffs' derivative claims.
Here, in deciding to take action against the third parties, the POA availed itself of the statutory procedure set out in N.C. Gen.Stat. § 55A-8-31 (2013) under the Nonprofit Corporation Act for conducting *202 a " conflict of interest transaction." Section 55A-8-31 provides that a transaction by the corporation is not voidable solely on the ground that one or more directors has a direct or indirect conflict of interest where one of the following is true:
(1) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board and the board or committee authorized, approved, or ratified the transaction;
(2) The material facts of the transaction and the director's interest were disclosed or known to the members entitled to vote and they authorized, approved, or ratified the transaction; or
(3) The transaction was fair to the corporation.
N.C. Gen.Stat. § 55A-8-31(a)(1)-(3). Additionally, section 55A-8-31 alters the requirement for achieving a quorum to vote on a conflict of interest transaction:
[A] conflict of interest transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the directors on the board of directors (or on the committee) who have no direct or indirect interest in the transaction, but a transaction shall not be authorized, approved, or ratified under this section by a single director. If a majority of the directors who have no direct or indirect interest in the transaction vote to authorize, approve, or ratify the transaction, a quorum is present for the purpose of taking action under this section.
N.C. Gen.Stat. § 55A-8-31(c).
It is undisputed that two of the five members on the Executive Board in 2012-Stead and Bolden-had no employment relationship with the Developers or any of the third parties. At a Special Meeting on 21 September 2012, convened nearly two weeks before plaintiffs filed their first complaint, Stead and Bolden voted to initiate litigation against the third parties seeking to hold them to account for damages to the common areas. Johnson, Cheers, and Lipscombe abstained from voting.
The parties dispute the legal effect of the Special Meeting vote. Plaintiffs contend that N.C. Gen.Stat. § 47F-3-108(c) (2013) of the North Carolina Planned Community Act requires that meetings of the Executive Board be held in accordance with Robert's Rules of Order *203 Newly Revised ("Robert's Rules ") unless the POA's Bylaws state otherwise. Because the Bylaws are silent on the effect of an abstention vote, plaintiffs argue Robert's Rules dictate that an abstention has the same effect as a vote of "no." Thus, they argue that the abstentions of Johnson, Cheers, and Lipscombe outnumbered the two votes in favor of initiating litigation at the Special Meeting and rendered the two votes of Stead and Bolden ineffective to constitute an act of the Executive Board. We are unpersuaded.
N.C. Gen.Stat. § 47F-3-102 provides that the POA may "[i]nstitute, defend, or intervene *87 in litigation or administrative proceedings on matters affecting the planned community," thus granting the POA authority to sue the third parties. Article VII, Section 4 of the Bylaws states: "Every act or decision done or made by a majority of the directors present at a duly held meeting at which a quorum is present shall be regarded as the act of the Executive Board." As discussed above, Stead and Bolden comprised a majority of disinterested directors when they decided to initiate litigation; therefore, as defined in section 55A-8-31(c), a quorum was present at the Special Meeting. Subsection (c) provides explicitly that "[t]he presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken" under section 55A-8-31. Therefore, a plain reading of Article VII, Section 4 of the Bylaws, section 47F-3-102, and section 55A-8-31 leaves no doubt that: (1) the POA had authority to sue the third parties or intervene in ongoing litigation against them; (2) Stead and Bolden voted to sue the third parties in a Special Meeting at which they constituted a quorum and the majority of disinterested directors; and therefore (3) the decision to initiate litigation against the third parties was a valid act of the Executive Board for the POA.
Having determined that the POA was properly authorized by a quorum of disinterested directors to file the intervenor complaint, we must now turn to the issue of standing.
"By its very nature, a derivative action requires that the shareholder bringing such an action have proper standing to bring the action." Robbins v. Tweetsie R.R., Inc., 126 N.C.App. 572, 577, 486 S.E.2d 453, 455 (1997). "As the party invoking jurisdiction, plaintiffs have the burden of proving the elements of standing." Blinson v. State, 186 N.C.App. 328, 333, 651 S.E.2d 268, 273 (2007). There are certain procedural and pleading requirements necessary to confer standing on shareholders in a derivative action, such as exhaustion of intra-corporate remedies, prior demand on directors, and contemporaneous ownership. See Alford v. Shaw, 320 N.C. 465, 471, 358 S.E.2d 323, 327 (1987) ;
*204 Swenson v. Thibaut, 39 N.C.App. 77, 100, 250 S.E.2d 279, 294 (1978). Due to the unique circumstances of this case, the procedural aspects of standing alone are insufficient to resolve this dispute. We must examine standing in light of the broader principles of corporate governance.
Generally, the proper plaintiff to bring a civil action is a "real party in interest." N.C. Gen.Stat. § 1-57 (2013). "A real party in interest ... is benefited or injured by the judgment in the case, ... [and] has the legal right to enforce the claim in question." Reliance Ins. Co. v. Walker, 33 N.C.App. 15, 18-19, 234 S.E.2d 206, 209 (1977) (citations and quotation marks omitted); see also Mangum v. Raleigh Bd. of Adjustment, 362 N.C. 640, 642, 669 S.E.2d 279, 281 (2008) ("As a general matter, the North Carolina Constitution confers standing on those who suffer harm[.]").
In the context of derivative litigation, the corporation is the real party in interest, because it is the corporation that has suffered the alleged harm, not the individual shareholders. See Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 522-23, 67 S.Ct. 828, 831, 91 L.Ed. 1067, 1073 (1947) ("The [derivative action] which such a plaintiff brings before the court is not his own but the corporation's. It is the real party in interest and he is allowed to act in protection of its interest somewhat as a 'next friend' might do for an individual, because it is disabled from protecting itself."); see also Ashburn v. Wicker, 95 N.C.App. 162, 166, 381 S.E.2d 876, 879 (1989), abrogated on other grounds, Alford v. Shaw, 327 N.C. 526, 534, 398 S.E.2d 445, 449 (1990).
Given that the corporation is the real party in interest, it follows that derivative actions are typically appropriate only when a corporation is unwilling or unable to litigate its claims for itself. "[Derivative suits] are one of the remedies which equity designed for those situations where the management through fraud, neglect of duty or other cause declines to take the proper and necessary steps to assert the rights which the corporation has. " See Meyer v. Fleming, 327 U.S. 161, 167, 66 S.Ct. 382, 386, 90 L.Ed. 595, 600 (1946) (emphasis added).
*88 It is important to remember the true nature of a suit of this character. The stockholders, suing and intervening, do not prosecute the cause in their own right and for their own benefit but in the right of the corporation and for its benefit. While nominally the company is named as a defendant, actually and realistically it is the true complainant, for any avails realized from the litigation belong to it and it alone. The only circumstance under which the individual stockholder is permitted to bring the suit is either the *205 refusal of those in control of the company to bring the proceeding or the fact that their relation to the subject of the complaint is such that demand upon those in control to bring the suit would be futile.
Swenson, 39 N.C.App. at 99, 250 S.E.2d at 293 (emphasis added) (citation omitted).
The POA is a nonprofit corporation organized in a typical manner, with its affairs managed by a group of directors.
The quintessential characteristic of corporate governance is private decision-making by directors as the appointed delegates of shareholders. Shareholders commit themselves to having their commercial affairs controlled by a board of directors when they make the decision to put their investment capital at risk in a corporation. In instituting derivative actions, shareholders seek to be released from this commitment which they have made to rule by directors. Shareholders are attempting to substitute their litigation decisions for those of their directors. This is the dilemma which shareholders derivative litigation presents to the courts. By entertaining such litigation, courts are required to sanction a fundamental change in the most basic of intra-corporate relationships. Derivative litigation is predicated upon the willingness of the court to reverse the roles of the directors and shareholders in corporate decision-making.... The courts wish to accommodate meritorious derivative litigation while at the same time preserving, to the greatest extent possible, the traditional intra-corporate relationship between shareholders and directors.
Brown, Shareholder Derivative Litigation and the Special Litigation Committee, 43 U. PITT. L. REV. . 601, 644 (1982).
Based on the foregoing principles and the facts specific to this case, we hold that the POA, not plaintiffs, has standing to sue the third parties. This conclusion is dependent upon the evolution of respective actions taken by plaintiffs and the POA and the status of those actions at this juncture. Nothing in this opinion should be construed to preclude homeowners from bringing derivative claims in the absence of proper corporate action.
As discussed above, the "real party in interest" for the derivative claims brought by plaintiffs is the POA. See *206 Ashburn, 95 N.C.App. at 166, 381 S.E.2d at 879. The requirement that a shareholder exhaust all intra-corporate remedies and make a demand on the corporation in order to acquire standing, unless such demand would be futile, is consistent with the principle that standing will not be conferred to the shareholder if the corporation chooses to assert claims for itself. See Fleming, 327 U.S. at 167, 66 S.Ct. at 386, 90 L.Ed. at 600 ; Swenson, 39 N.C.App. at 99, 250 S.E.2d at 293. Because the POA has elected to bring its own claims against the third parties, we must conclude that plaintiffs do not have standing to bring those same claims on the POA's behalf.
Nevertheless, plaintiffs cite two New Jersey decisions for the proposition that members of a property owners' association can bring derivative claims on behalf of the association whenever it is under the control of the developer, regardless of the association's willingness to bring the claims for itself. See Siller v. Hartz Mountain Associates, 93 N.J. 370, 461 A.2d 568, 574 (1983) (noting in obiter dictum that under New Jersey law homeowners may sue a developer on behalf of a homeowners' association "irrespective of its governing board's willingness to sue during the period of time that the association remains under the control of the developer"); Harbor View Condominium Ass'n, Inc. v. Manhattan Skyline III, 2011 WL 3207956 (N.J.Super.2011) (unpublished) (citing Siller for the same proposition). These decisions are not binding on this Court. Morton *89 Buildings, Inc. v. Tolson, 172 N.C.App. 119, 127, 615 S.E.2d 906, 912 (2005).
Furthermore, neither of the New Jersey decisions applied the rule relied upon by plaintiffs. In Siller, the court concluded that because the dispute was "confined to the common areas and facilities, [it] agree[d] with the trial court and the Appellate Division that the Association had exclusive standing to maintain the action." Siller, 461 A.2d at 575. The Harbor View decision, which was unpublished and focused on the doctrine of laches, merely noted Siller's dicta in its own dicta. Neither Siller nor Harbor View applied this reasoning to allow homeowners to bring derivative claims.
In any event, we do not find the rule alluded to in the New Jersey decisions persuasive here. This bright-line rule would reverse the relationship between a property owners' association's members and directors regarding litigation decisions whenever the developer has control over the board. Such a rule alters the traditional principles of corporate governance in the context of property owners' association litigation, and its application here would usurp the role of our legislature in striking the appropriate balance of power among members and directors of a property owners association.
*207 The relationships between the parties here is not unique to this case, but were clearly authorized by our General Assembly in the North Carolina Planned Community Act. See 1998 N.C. Sess. Laws § 199. Under N.C. Gen.Stat. § 47F-3-103(d) (2013), a planned community declaration "may provide for a period of declarant control of the association, during which period a declarant, or persons designated by the declarant, may appoint and remove the officers and members of the executive board." The Developers, as the declarants, were therefore well within their statutory rights to include a period of control over the Executive Board into the terms of Master Declaration, which plaintiffs assented to when they purchased their homes subject to the conditions in the property management agreement. This arrangement is specifically authorized under both the Uniform Planned Community Act, approved by the national Conference of Commissioners on Uniform State Laws in 1980, and the North Carolina Condominium Act, which sets out similar rules for North Carolina condominium developers. See Hetrick, Of "Private Governments" and the Regulation of Neighborhoods: The North Carolina Planned Community Act, 22 Campbell L. Rev. 1, 60-61 (1999) (noting that "[i]t is typical with planned communities that the declarant controls the association in the early stages of the development"); see also N.C. Gen.Stat. § 47C-3-103 cmt. 3 (2013) (referring to declarant control over a condominium owners' association during initial stages of development as a "practical necessity").
We acknowledge plaintiffs' concern that, given the declarant's statutory right to appoint and remove members of a property owners' association's executive board, the association itself may be prone to "give away the store" rather than pursue litigation against the developer as vigorously as property owners believe necessary. However, the fact that the declarant has the ability to appoint the members of an executive board does not mean that the board will always refuse to take adverse action against the declarant. We are satisfied that the statutory frameworks in both the Planned Community Act and the Nonprofit Corporation Act utilized here contain sufficient safeguards to prevent that type of abuse.
The members of the Executive Board are required by N.C. Gen.Stat. § 55A-8-30 to discharge their duties in good faith and in the manner reasonably believed to be in the best interests of the POA. The Special Meeting vote to initiate litigation against the third parties would not have been effective pursuant to section 55A-8-31 without at least two disinterested members of the Executive Board, demonstrating at the very least a threshold structural safeguard. Plaintiffs could have challenged whether the Special Meeting vote fit into one of the three categories *208 in section 55A8-31(a), but there is no indication in the record or their briefs that they did so. Plaintiffs also contend that the POA's delay in initiating litigation demonstrates a refusal of plaintiffs' demands, but they overlook the fact that the Special Meeting *90 vote took place almost two weeks before plaintiffs initiated this lawsuit.
Finally, we note that plaintiffs' derivative claims for breach of fiduciary duty, constructive fraud, actual fraud, and civil conspiracy against certain Executive Board members are still viable. Defendants Stead, Bolden, Johnson, Cheers, Lipscombe, and Wrigley have not appealed the trial court's denial of their motion to dismiss these claims. More importantly, plaintiffs have not been deprived of standing to bring derivative claims against the Executive Board members because the POA has refused to bring those claims, and it would be futile to ask the Executive Board members to sue themselves.
In sum, without more, plaintiffs' bare assertion that the POA cannot be trusted to litigate its own claims against the third parties is premature and at this stage of the proceedings cannot overcome: (1) the POA's decision was made by disinterested directors through a valid act of the Executive Board, and (2) well-settled law and principles of corporate governance requiring refusal by the corporation or futility before members may litigate claims on its behalf. See Fleming, 327 U.S. at 167, 66 S.Ct. at 386, 90 L.Ed. at 600 ; Swenson, 39 N.C.App. at 99, 250 S.E.2d at 293. Accordingly, we conclude that the POA, not plaintiffs, had standing to sue the third parties for the alleged harm done to the corporation. Accordingly, we affirm the trial court's dismissal of plaintiffs' derivative claims against the third parties for lack of standing, and we affirm the trial court's denial of plaintiffs' motion to dismiss the POA's intervenor complaint.[5]
II. Derivative Claims Against Five Executive Board Members
Plaintiffs next argue that the trial court erred by dismissing their derivative claims against five of the eleven Executive Board members named as defendants in the Fourth Amended Verified Complaint and the Executive Board itself. The trial court concluded that the statute of limitations was an insurmountable bar to recovery against the five Executive Board members, and that the complaint otherwise failed to *209 state a claim upon which relief could be granted against the Executive Board. We affirm the trial court's order.
We review an order granting a 12(b)(6) motion for whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true. Country Club of Johnston County, Inc. v. U.S. Fidelity & Guar. Co., 150 N.C.App. 231, 238, 563 S.E.2d 269, 274 (2002). "This Court must conduct a de novo review of the pleadings to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct." Leary v. N.C. Forest Products, Inc., 157 N.C.App. 396, 400, 580 S.E.2d 1, 4 (2003).
It appears from the record that the derivative claims dismissed by the trial court against the Executive Board members were for: (1) breach of fiduciary duty; (2) constructive fraud; (3) actual fraud; and (4) civil conspiracy. The only arguments plaintiffs have raised on appeal regarding their derivative claims against the Executive Board members is that the trial court improperly applied a three-year statute of limitations for the claim of constructive fraud when it should have instead applied the ten-year limitation under N.C. Gen.Stat. § 1-56 (2013) and that the claim of constructive fraud was sufficiently pled.
Plaintiffs failed to raise arguments on appeal relating to the dismissal of any of the other claims against the Executive Board members or any claims against the Executive Board as an entity. Accordingly, any such arguments are deemed abandoned. See N.C. R.App. P. 28(a) (2013) ("Issues not presented and discussed in a party's brief are deemed abandoned."); see also *91 Tyll v. Berry, --- N.C.App. ----, ----, 758 S.E.2d 411, 423 (2014).
Turning to plaintiffs' sole remaining argument on appeal in this context, we conclude that even under a ten-year statute of limitations, plaintiffs' derivative claims of constructive fraud against former Executive Board members Weeks, Lawing, Scanlon, Genova, and Satrape were properly dismissed.
The elements of constructive fraud are: "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." White v. Consol. Planning, Inc., 166 N.C.App. 283, 294, 603 S.E.2d 147, 156 (2004).
Plaintiffs allege that these Executive Board members served to benefit the Developers (and by extension themselves) and harm the POA in *210 the following ways: (1) by concealing or failing to disclose the defects to the common areas; (2) failing to remedy the defects; (3) accepting ownership of defective common areas; (4) paying for maintenance and repair work to the common areas while they were owned by the Developers; and (5) failing to take adverse action against the Developers.
However, none of the five dismissed Executive Board members served in the capacity of board member later than 2006. The Developers conveyed the ponds and the bulkhead to the POA in December 2008 and December 2009, respectively. The complaint alleges that "the Board knew, or should have known, of the defective condition of the bulkhead at that time "-after December 2008 and 2009-at least two years after the dismissed Executive Board members had stepped down from the board. There are no facts alleged in the complaint indicating when the perforated pipes were installed or when the ponds began to drain. There is similarly no allegation that the dismissed Executive Board members knew about the Developers' installation of the perforated pipes. All other allegations regarding the bulkhead took place at least two years after the dismissed Executive Board members had left the board.
In short, the Fourth Amended Verified Complaint contains no allegation that the five dismissed Executive Board members took advantage of their positions of trust to benefit themselves and harm the corporation-two essential elements of the claim of constructive fraud-during their years of service on the board when they owed a duty to the corporation. See White, 166 N.C.App. at 294, 603 S.E.2d at 156 ; see also Trillium Ridge Condominium Ass'n, Inc. v. Trillium Links & Village, LLC, --- N.C.App. ----, ----, 764 S.E.2d 203, 220 (2014) (affirming summary judgment for the defendants on a claim of constructive fraud where the plaintiff adduced no evidence "tending to show that [the defendants] sought to benefit themselves in the transaction").
Accordingly, the Fourth Amended Verified Complaint failed to state a valid claim of constructive fraud against the dismissed Executive Board members. We therefore affirm the trial court's order, albeit for a reason other than the statute of limitations. See Manpower of Guilford County, Inc. v. Hedgecock, 42 N.C.App. 515, 519, 257 S.E.2d 109, 113 (1979) ("A correct ruling by a trial court will not be set aside merely because the court gives a wrong or insufficient reason for its ruling. The ruling must be upheld if it is correct upon any theory of law." (citation omitted)).
Conclusion
For the foregoing reasons, we affirm the trial court's orders: (1) dismissing plaintiffs' derivative claims against the third parties;
*211 (2) dismissing plaintiffs' derivative claims against Weeks, Lawing, Scanlon, Genova, Satrape, and the Executive Board; and (3) denying plaintiffs' motion to dismiss the POA's intervenor complaint.
AFFIRMED.
Judge ELMORE concurs.
Judge HUNTER, JR. concurs in result only by separate opinion.

As property owners at SeaScape, plaintiffs are members of the POA. The third parties that they sued derivatively are: Mark Saunders; MAS Properties, LLC; Coastal Construction of Eastern NC, LLC; SeaScape at Holden Plantation, LLC; The Coastal Companies, LLC; Eastern Carolinas' Construction & Development, LLC; Cape Fear Engineering, Inc.; Brunswick County; Brunswick County Inspection Department; Elmer Delaney Aycock; Harold Douglas Morrison; Anthony Sion Wicker; and David Heacham Stanley (collectively "the third parties").

The Executive Board members dismissed from the suit are Daniel H. Weeks; Susan Lawing; Sean Scanlon; Richard Genova; and Dean Satrape.

Saunders is alleged to be the founder, chief executive officer, and/or principal member/owner of SeaScape LLC; MAS Properties, LLC; The Coastal Companies, LLC; Eastern Carolinas' Construction & Development, LLC; and Coastal Construction of Eastern NC, LLC.

Plaintiffs cite for support of this argument section 55A-7-40's predecessor in the business corporation context-N.C. Gen.Stat. § 55-7-40 -which contains nearly identical language. See N.C. Gen.Stat. § 55-7-40(b) (1990) (repealed); see also Allen ex rel. Allen & Brock Const. Co., Inc. v. Ferrera, 141 N.C.App. 284, 288, 540 S.E.2d 761, 765 (2000) (noting that section 55-7-40(b) allowed for a futility exception to the demand requirement where the directors in control of the corporation were alleged of wrongdoing).

Given our ruling that the POA, and not plaintiffs, has standing to pursue these claims against the third parties because of the POA's actions following plaintiffs' demands, we need not address: (1) whether plaintiffs' derivative claims were rendered moot upon the filing of the POA's intervenor complaint; (2) the Developers' argument that some plaintiffs were not members of the POA at the time of the alleged wrongdoing; or (3) arguments pertaining to the rule in Barger v. McCoy Hillard & Parks, 346 N.C. 650, 488 S.E.2d 215 (1997).